BRODSKY & SMITH, LLC
EVAN J. SMITH (SBN 242352)
9595 Wilshire Blvd.
Beverly Hills, CA 90212
Telephone: (877) 534-2590
Facsimile: (310) 247-0160

PROFY PROMISLOFF & CIARLANTO, P.C.
JEFFREY. J. CIARLANTO
JOSEPH M. PROFY
DAVID M. PROMISLOFF
100 N. 22nd Street, Unit 105
Philadelphia, PA 19103
Telephone: (215) 259-5156
Facsimile: (215) 600-2642

*Counsel for Plaintiff Bernard Stern*

[Additional Counsel on Signature Page]

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

---

BERNARD STERN, derivatively on behalf of SUNPOWER CORPORATION,

          Plaintiff,

v.

THOMAS H. WERNER, CHARLES D. BOYNTON, ARNAUD CHAPERON, BERNARD CLÉMENT, DENIS GIORNO, DANIEL LAURÉ, CATHERINE A. LESJAK, THOMAS R. MCDANIEL, HUMBERT DE WENDEL and PAT WOOD III,

          Defendants,

and

SUNPOWER CORPORATION,

          Nominal Defendant.

---

: Civil Action No.

: **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTIES AND UNJUST ENRICHMENT**

: **DEMAND FOR JURY TRIAL**

1.     Plaintiff Bernard Stern ("Plaintiff"), by and through his undersigned attorneys, hereby submits this Verified Shareholder Derivative Complaint for Breach of Fiduciary Duties and Unjust Enrichment (the "Complaint") for the benefit of nominal defendant SunPower Corporation ("SunPower" or the "Company") against certain current and/or former members of its Board of Directors (the "Board") and executive officers, seeking to remedy defendants' breaches of fiduciary duties and unjust enrichment from at least February 2016 through the present (the "Relevant Period").

### NATURE OF THE ACTION

2.     According to its public filings, SunPower is an energy company that delivers solar solutions to residential, commercial, and power plant customers.  The Company's offerings purportedly include: solar module technology and solar power systems that are designed to generate electricity over a system life typically exceeding 25 years; integrated Smart Energy software solutions; installation, construction, and ongoing maintenance, and monitoring services; and financing solutions that provide customers a variety of options for purchasing or leasing solar products.

3.     On April 28, 2011, SunPower and Total Energies Nouvelles Activités USA, SAS, formerly known as Total Gas & Power USA, SAS ("Total"), a subsidiary of Total S.A. ("Total S.A."), entered into the Tender Offer Agreement, pursuant to which, on June 21, 2011, Total purchased approximately 60% of SunPower's then-outstanding shares of common stock for a total cost of approximately $1.4 billion (the "Tender Offer").  Total has owned at least 50% of SunPower common stock since that time.

4.     Specifically, according to SunPower's Proxy Statement filed with the United States Securities and Exchange Commission ("SEC") on March 17, 2016 (the "2016 Proxy"), Total owns 64.23% of SunPower common stock.  As such, Total is SunPower's controlling stockholder.

5.     On August 9, 2016, Defendants (defined herein) caused the Company to issue a press release announcing its second quarter 2016 financial results.  Therein, Defendants disclosed the existence of several factors negatively impacting the Company's performance, including "customers adopting a longer-term timeline for project completion," "aggressive [Power Purchase Agreement

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTIES AND UNJUST ENRICHMENT

1  ("PPA")] pricing by new market entrants," and "continued market disruption in the YieldCo

2  environment."  Defendants also announced a manufacturing realignment, which Defendants stated

3  would result in restructuring charges totaling $30-$45 million, a substantial portion of which would

4  be incurred in the third quarter of 2016.  Finally, Defendants caused the Company to disclose that, as

5  a result of these "challenges," it was substantially decreasing its fiscal year 2016 guidance – expecting

6  a net loss of $175 million to $125 million, rather than the earlier-forecasted net income of $0 to $50

7  million.

8        6.    Accordingly, during the Relevant Period, Defendants made or caused the Company to

9  make materially false and/or misleading statements, as well as failed to disclose material adverse facts

10  about the Company's business, operations, and prospects.  Specifically, Defendants made false and/or

11  misleading statements and/or failed to disclose: (1) that under their direction and on their watch a

12  substantial number of the Company's customers were adopting a longer-term timeline for project

13  completion; (2) that the Company's near-term economic returns were deteriorating due to aggressive

14  PPA pricing by new market entrants; (3) that market disruption in the YieldCo environment was

15  impacting the Company's assumptions related to monetizing deferred profits; (4) that, as such,

16  demand for the Company's products was significantly declining; (5) that, in response, Defendants

17  would cause the Company to implement a manufacturing realignment that would result in significant

18  restructuring charges; (6) that, as such, the Company's fiscal year 2016 guidance (issued under

19  Defendants' direction and on their watch) was overstated; and (7) that, as a result of the foregoing,

20  Defendants' statements about SunPower's business, operations, and prospects, were false and

21  misleading and/or lacked a reasonable basis.

22        7.    After the truth regarding these false and misleading statements was revealed on August

23  9, 2016, SunPower's stock price fell $4.47 per share, or 30%, to close at $10.31 per share the next

24  day.

25        8.    Further, the price of the Company's stock still has not recovered, and currently trades

26  below that share price.

27        9.    Thus, as a result of Defendants' breaches and other misconduct, the Company has

28

- 2 -

1  suffered damages.

2  **JURISDICTION AND VENUE**

3    10. This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2)

4  in that Plaintiff and the Defendants are citizens of different states, and citizens of a foreign state are

5  additional parties; and the matter in controversy exceeds $75,000.00, exclusive of interests and costs.

6  This action is not a collusive one to confer jurisdiction on a court of the United States which it would

7  not otherwise have.

8    11. Venue is proper in this district because SunPower conducts business and maintains its

9  principal executive offices this district.  Upon information and belief, one or more of the Defendants

10  resides in this district.  Further, SunPower engages in numerous activities and conducts business here,

11  which had an effect in this district.

12  **THE PARTIES**

13    12. Plaintiff is a current shareholder of SunPower and has continuously held SunPower

14  stock since 2013.  Plaintiff is a citizen of Palm Beach County, Florida.

15    13. Nominal defendant SunPower is a Delaware corporation with its principal executive

16  offices located at 77 Rio Robles, San Jose, California 95134.

17    14. Defendant Thomas H. Werner ("Werner") has served as the Company's President and

18  Chief Executive Officer ("CEO") since May 2010, as a director of the Company since June 2003, and

19  as Chairman of the Board since May 2011.  Additionally, from June 2003 to April 2010, Werner

20  served as the Company's CEO.  According to the 2016 Proxy, defendant Werner is not independent.

21  Upon information and belief, defendant Werner is a citizen of California.

22    15. Defendant Charles D. Boynton ("Boynton") has served as the Company's Executive

23  Vice President and Chief Financial Officer ("CFO") since March 2012.  Previously, in March 2012,

24  Boynton also served as the Company's Acting Financial Officer.  Further, from June 2010 to March

25  2012, Boynton served as the Company's Vice President, Finance and Corporate Development.  Upon

26  information and belief, defendant Boynton is a citizen of California.

27    16. Defendant Arnaud Chaperon ("Chaperon") has served as a director of the Company

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTIES AND
UNJUST ENRICHMENT

since 2011.  Defendant Chaperon currently serves as the Senior Vice President of Prospective Analysis, Institutional Relations and Communications for the New Energies division of Total S.A. Before taking this position with the New Energies division in 2007, Chaperon was the Managing Director for five years of Total E&P Qatar and country representative of the Total group, which has oil, gas and petrochemical assets and operations in the State of Qatar.  Before that, he held other positions within the Total group, where he has been employed since 1980.  According to the 2016 Proxy, defendant Chaperon is a director designated by controlling stockholder Total, and as a result is not independent.  Upon information and belief, defendant Chaperon is a citizen of France.

17.     Defendant Bernard Clément ("Clément") has served as a director of the Company since 2011.  Defendant Clément has served as the Senior Vice President, Business & Operations, of the New Energies division of Total S.A. since July 1, 2012.  Before that appointment, he was Senior Vice President of Gas Assets, Technology, and Research & Development for the Gas & Power division of Total S.A. since January 1, 2010.  Further, from 2003 through 2009, Clément served as Vice President of the Exploration & Production division of Total S.A. relative to its interests in the Middle East.  Before that, he held other positions within the Total group, where he has been employed since 1983.  According to the 2016 Proxy, defendant Clement is a director designated by controlling stockholder Total, and as a result is not independent.  Upon information and belief, defendant Clément is a citizen of France.

18.     Defendant Denis Giorno ("Giorno") has served as a director of the Company since 2011.  Defendant Giorno served as President and CEO of Total New Energies USA from January 2013 until April 2016, and as Special Advisor Renewable Energies at Total S.A. from May 2016 until June 2016.  Additionally, from November 2011 until January 2013, he also served as President and General Manager.  Further, from October 2007 until October 2011, he served as the Vice President of New Ventures for the Gas & Power division of Total S.A.  Finally, from 2005 to 2007, Giorno was Vice President, Business Development, of the Gas & Power division relative to Total's interests in Asia, South America, and Africa.  Before that, he held other positions within the Total group, where he had been employed since 1975.  According to the 2016 Proxy, defendant Giorno is a director

- 4 -

designated by controlling stockholder Total, and as a result is not independent.  Upon information and belief, defendant Giorno is a citizen of California.

19.    Defendant Daniel Lauré ("Lauré") has served as a director of the Company since March 11, 2016.  Defendant Lauré currently serves as President and CEO of Total New Energies USA Inc.  Before taking this position in March 2016, Lauré served as Senior Vice President Industrial Assets, Finance & Information Technology from 2012 through 2015.  Before that, he held other positions within Total Gas & Power beginning in 2004, including Vice President, Strategy, Markets & IT, and Deputy Director, Renewable Energy, Strategy, Human Resources & Communication.  Prior to those positions, Lauré held various other positions within the Total Group, where he has been employed since 1988.  According to the 2016 Proxy, defendant Lauré is a director designated by controlling stockholder Total, and as a result is not independent.  Upon information and belief, defendant Lauré is a citizen of France.

20.    Defendant Catherine A. Lesjak ("Lesjak") has served as a director of the Company since 2013.  In addition, defendant Lesjak served as a member of the Board's Audit Committee (the "Audit Committee") during the Relevant Period.  Upon information and belief, defendant Lesjak is a citizen of California.

21.    Defendant Thomas R. McDaniel ("McDaniel") has served as a director of the Company since 2009.  In addition, defendant McDaniel served as Chair of the Audit Committee during the Relevant Period.  Upon information and belief, defendant McDaniel is a citizen of California.

22.    Defendant Humbert de Wendel ("de Wendel") has served as a director of the Company since 2011.  Defendant de Wendel has served as the Total group Treasurer since the beginning of 2012. Previously, de Wendel served as the Senior Vice President of Corporate Business Development for Total from 2006 to 2011.  Further, from 2000 to 2006, de Wendel served as a Vice President for Total, overseeing finance operations of its exploration and production subsidiaries.  Before that, he held other positions within the Total group, where he has been employed since 1982.  According to the 2016 Proxy, defendant de Wendel is a director designated by controlling stockholder Total, and

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTIES AND UNJUST ENRICHMENT

as a result is not independent.  Upon information and belief, defendant de Wendel is a citizen of France.

23.     Defendant Pat Wood III ("Wood") has served as a director of the Company since 2005. In addition, defendant Wood served as a member of the Audit Committee during the Relevant Period. Upon information and belief, defendant Wood is a citizen of Texas.

24.     Collectively, defendants Werner, Boynton, Chaperon, Clément, Giorno, Lauré, Lesjak, McDaniel, de Wendel, and Wood shall be referred to herein as "Defendants."

25.     Collectively, defendants Lesjak, McDaniel, and Wood shall be referred to as the "Audit Committee Defendants."

26.     Collectively, defendants Chaperon, Clement, Giorno, Lauré, and de Wendel shall be referred to as the "Total Defendants."

**DEFENDANTS' DUTIES**

27.     By reason of their positions as officers, directors, and/or fiduciaries of SunPower and because of their ability to control the business and corporate affairs of SunPower and its subsidiaries, Defendants owed SunPower and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage SunPower in a fair, just, honest, and equitable manner.  Defendants were and are required to act in furtherance of the best interests of SunPower and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to SunPower and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

28.     Defendants, because of their positions of control and authority as directors and/or officers of SunPower, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.  Because of their advisory, executive, managerial, and directorial positions with SunPower, each of the Defendants had knowledge of material non-public information regarding the Company.

29. To discharge their duties, the officers and directors of SunPower were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company. By virtue of such duties, the officers and directors of SunPower were required to, among other things:

    a. Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

    b. Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority; and

    c. When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

30. Additionally, the Company's Code of Business Conduct and Ethics (the "Code of Ethics"), which expressly applies to all Defendants named herein, states the following:

> All Company Related Personnel are responsible for full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with, or submits to, the U.S. Securities and Exchange Commission and in other public communications made by the Company. Accordingly, it is the responsibility of Company Related Personnel to bring promptly, or cause to be brought, to the attention of the Company's Audit Committee, any material information of which he or she may become aware that affects the disclosures made by the Company in its public filings, submissions or communications or otherwise assist such persons in fulfilling their and the Company's responsibilities with respect to such public filings, submissions or communications. All Company Related Personnel shall promptly bring, or cause to be brought, to the attention of the Audit Committee, any information he or she may have concerning (a) significant deficiencies and material weaknesses in the design or operation of the Company's internal control over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarize, and report financial information or (b) any fraud, whether or not material, that involves management or other Company Related Personnel who have a significant role in the Company's internal control over financial reporting.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTIES AND UNJUST ENRICHMENT

31.     Pursuant to the terms of the Audit Committee's Charter, the Audit Committee Defendants were responsible for, *inter alia*:

    a.  Reviewing and discussing with management the financial information to be included in the Company's Annual Report on SEC Form 10-K, including the clarity of the disclosures in the financial statements, any major issues as to the adequacy of the Company's internal controls, and any special procedures taken in light of material control deficiencies;

    b.  Reviewing and discussing with management the quarterly financial information to be included in the Company's quarterly reports on Form 10-Q, including the disclosures under management's discussion and analysis;

    c.  Reviewing the Company's compliance with laws and regulations, including major legal and regulatory initiatives, and any major litigation or investigations against the Company that may have a material impact on the Company's financial statements, including meeting and discussing such matters with management and others as appropriate, including the General Counsel;

    d.  Reviewing with the CEO and CFO, the Company's disclosure controls and procedures; and

    e.  Reviewing and assessing the adequacy of, management's plans for risk control or mitigation, periodically reporting to the Board the Committee's assessment and recommendations, and assisting the Board in its discussions with management with respect to risk assessment and risk management.

## SUBSTANTIVE ALLEGATIONS

### A.   <u>Background of the Company and Total's Control</u>

32.     According to its public filings, SunPower is an energy company that delivers solar solutions to residential, commercial, and power plant customers.   The Company's offerings purportedly include: solar module technology and solar power systems that are designed to generate electricity over a system life typically exceeding 25 years; integrated Smart Energy software

1   solutions;  installation,  construction,  and  ongoing  maintenance,  and  monitoring  services;  and

2   financing  solutions  that  provide  customers  a  variety  of  options  for  purchasing  or  leasing  solar

3   products.

4        33.     On April 28, 2011, SunPower and Total, a subsidiary of Total S.A., entered into a

5   Tender Offer Agreement (the "Tender Offer Agreement").  Pursuant to the Tender Offer Agreement,

6   on June 21, 2011, Total purchased in a cash tender offer approximately 60% of the outstanding shares

7   of SunPower's former Class A common stock and 60% of the outstanding shares of SunPower's

8   former Class B common stock.  Total has owned at least 50% of SunPower common stock since that

9   time.  According to the 2016 Proxy, Total owns 64.23% of SunPower common stock.  As such, Total

10   is SunPower's controlling stockholder.

11        34.     In connection with the Tender Offer, SunPower and Total entered into an Affiliation

12   Agreement that governs the relationship between Total and SunPower following the close of the

13   Tender Offer (the "Affiliation Agreement").   In accordance with the terms of the Affiliation

14   Agreement, the SunPower Board has nine members, composed of the CEO, three non-Total-

15   designated members of the Board, and five directors designated by Total.

16        **B.**     **Defendants' False and Misleading Statements Issued During the Relevant Period**

17        35.     On February 17, 2016, Defendants caused the Company to issue a press release

18   entitled, "SunPower Reports Fourth Quarter and Fiscal Year 2015 Results."  The press release set

19   forth, in relevant part:

20        SAN JOSE, Calif., February 17, 2016 - SunPower Corp. (NASDAQ: SPWR) today

21   announced financial results for its fourth quarter and fiscal year ended Jan. 3, 2016.

| ($ Millions, except percentages and per-share data) | 4th Quarter 2015 | 3rd Quarter 2015 | 4th Quarter 2014 |
|---|---|---|---|
| GAAP revenue | $374.4 | $380.2 | $1,164.2 |
| GAAP gross margin | 5.4% | 16.5% | 22.3% |
| GAAP net income (loss) | $(127.6) | $(56.3) | $134.7 |
| GAAP net income (loss) per diluted share | $(0.93) | $(0.41) | $0.83 |
| Non-GAAP revenue[1] | $1,363.9 | $441.4 | $609.7 |
| Non-GAAP gross margin[1] | 28.8% | 17.7% | 20.4% |
| Non-GAAP net income[1] | $270.4 | $20.5 | $39.4 |
| Non-GAAP net income per diluted share[1] | $1.73 | $0.13 | $0.26 |
| EBITDA[1] | $379.9 | $54.2 | $84.9 |

[1] Information about SunPower's use of non-GAAP financial information is provided under "Use of Non-GAAP Financial Measures" below.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTIES AND UNJUST ENRICHMENT

"2015 was a transformational year for the solar industry as increasing demand, favorable policy developments and broad global support for renewables created strong industry growth fundamentals. SunPower benefited from these trends as we exceeded our forecasts and closed out the year with record fourth quarter and full year non-GAAP 2015 results. During the year, we executed on our technology roadmaps, added new products and launched our joint YieldCo vehicle 8point3 Energy Partners. We are well positioned to capitalize on the continued growing adoption of solar in North America as well as key international markets such as China and Latin America. We also expanded our global power plant footprint while completing the world's largest solar power plant, located in California. In distributed generation, we made further investments in Smart Energy and launched a range of complete customer solutions for the commercial market that will significantly reduce cost while improving performance," said Tom Werner, SunPower president and CEO. "Upstream, we again delivered record output and yield while ramping our new Fab 4 cell manufacturing facility for volume production in 2016. We made strong progress on our cost reduction roadmaps and in the fourth quarter announced the launch of our new lower cost, high efficiency Performance Series product line which enhances our ability to rapidly expand SunPower's global footprint with significantly lower capital cost.

"In the power plant segment for the fourth quarter, we successfully met our project commitments, added to our pipeline and further built out our U.S. HoldCo asset base, improving visibility for drop downs to 8point3 Energy Partners in 2016. Specifically, our 135-megawatt (MW) Quinto project achieved commercial operation during the quarter and is now generating energy for 8point3 Energy Partners. Our quarterly power plant segment results benefited from strong Engineering, Procurement and Construction (EPC) execution as our 50-MW Hooper project for Xcel was completed a quarter ahead of schedule. We also commenced construction on our 100-MW project for NV Energy in Nevada and recently dedicated our second 15-MW project at Nellis Air Force base. Going forward, we see significant upside opportunity in the U.S. power plant market as the recent extension of the U.S. federal solar investment tax credit (ITC) provides a sustainable, long term market structure to support further growth.

Internationally, we continue to expand our footprint into new markets and recently announced our first project in Mexico, a 36-MW project for Aeropuertos Del Sureste (ASUR), a leading airport operator in the country. This power purchase agreement (PPA) is one of the first significant solar PPAs in Mexico and extends our position as a leader in international solar development. Construction of this project will begin this year and is expected to be completed in 2017.

"We also executed well in our residential business. In North America, our performance was solid as our fourth quarter results exceeded plan, we gained market share and broadened our leasing footprint as megawatt installed growth exceeded 45 percent year over year. Additionally, based on our fourth quarter bookings, we expect continued strong residential demand in 2016. Finally, we also expanded our utility partnership strategy during the quarter as we announced an innovative agreement with TXU Energy to bring SunPower solar solutions to the Texas market.
In our commercial segment, we are well positioned for 2016, having added projects to our backlog and building our pipeline to over $1 billion. As we announced during the quarter, we launched our Helix platform, the world's first fully-integrated solar solution for commercial customers. Designed for the rooftop, carport and commercial ground-mount markets, Helix delivers significantly lower costs and improved reliability while reducing installation times. We are currently shipping our first

- 10 -

systems, and interest from both new and existing customers is significant. Finally, we were pleased to announce that we recently completed our first commercial project drop down to 8point3 Energy Partners. This 20-MW project for Kern County School District consists of 27 carports at various locations across the district and will be constructed in three phases with completion scheduled before the end of 2016," Werner concluded.

"Solid execution across all segments, along with the ability to leverage our development capabilities, enabled us to post record results for the fourth quarter and 2015 fiscal year," said Chuck Boynton, SunPower CFO. "Our balance sheet remains strong as we successfully executed a new convertible bond offering and recently renewed our revolver including increasing its size to $300 million. With an approximately $1 billion cash position and our undrawn revolver, we have the resources we need to continue our long term growth initiatives. Finally, we prudently managed our working capital during the quarter as we improved our performance in a number of key cash metrics while adding assets to our HoldCo base."

Fourth quarter and fiscal year 2015 GAAP and non-GAAP results reflect a charge of $33 million, or approximately 20 cents on a non-GAAP basis, related to the contracted sale, at current market based rates, of above market priced polysilicon acquired through a long term supply agreement.

Additionally, fourth quarter fiscal 2015 non-GAAP results include net adjustments that, in the aggregate, increased non-GAAP net income by $398.0 million, including $394.1 million related to 8point3 Energy Partners, $13.1 million related to utility and power plant projects, $2.0 million related to sale of operating lease assets, $16.5 million related to stock-based compensation expense, $1.7 million related to the 8point3 Energy Partners initial public offering, and $3.3 million related to other adjustments, offset by $32.7 million related to tax effect.

**Financial Outlook**

Given strong global demand as well as a favorable policy environment, the company remains very confident that it can achieve its long term strategic and financial goals by leveraging its flexible business model to drive sustainable growth. With the recent extension of the ITC, the company anticipates increasing its investment in the United States while maintaining its global go-to-market focus.

The company's fourth quarter financial results reflected a shift of approximately $65 million in EBITDA originally forecasted to be recognized in fiscal year 2016. This shift was primarily due to earlier than forecasted project completions in power plants, accelerated recognition of residential leases and earlier than anticipated benefits related to 8point3 Energy Partners. As a result of this approximately $65 million EBITDA shift, the company now expects 2016 EBITDA to be in the range of $450 million to $500 million compared to previous guidance of $515 million to $565 million. For 2017, the company believes that with the ITC extension, further investment in the U.S. market and a strong global project pipeline, it is well positioned to sustainably grow its EBITDA.

For fiscal year 2016, the company's non-GAAP expectations are as follows: revenue of $3.2 billion to $3.4 billion, gross margin of 14 percent to 16 percent, capital expenditures of $210 million to $240 million and gigawatts deployed in the range of 1.7 GW to 2.0 GW. On a GAAP basis, the company expects 2016 revenue of $2.2 billion to $2.4 billion, gross margin of 17 percent to 19 percent and net income of $0

- 11 -

million to $50 million. Fiscal year 2016 GAAP guidance includes the impact of the company's HoldCo strategy and deferrals due to real estate accounting.

The company's first quarter fiscal 2016 non-GAAP guidance is as follows: revenue of $290 million to $340 million, gross margin of 12 percent to 13 percent, EBITDA of $0 to $25 million and megawatts deployed in the range of 315 MW to 340 MW. On a GAAP basis, the company expects revenue of $280 million to $330 million, gross margin of 11 percent to 12 percent and net loss of $115 million to $90 million. First quarter 2016 GAAP guidance includes the impact of the company's HoldCo strategy and deferrals due to real estate accounting.

36.     On February 19, 2016, Defendants caused SunPower to file its Annual Report with the SEC on Form 10-K for the fiscal year ended January 3, 2016 (the "2015 10-K"). The Company's 2015 10-K was signed by defendants Werner and Boynton, while defendants Chaperon, Clement, Giorno, Lesjak, McDaniel, de Wendel and Wood authorized defendant Boynton through his Power of Attorney sign the 2015 10-K on their behalf. Thus, for all intents and purposes, the 2015 10-K was signed by defendants Werner, Boynton, Chaperon, Clement, Giorno, Lesjak, McDaniel, de Wendel and Wood. The 2015 10-K reaffirmed the Company's financial results announced in the press release issued on February 17, 2016. In addition, the 2015 10-K contained certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX Certifications"), signed by defendants Werner and Boynton, which set forth:

I, [Thomas H. Werner/Charles D. Boynton], certify that:

1.     I have reviewed this Annual Report on Form 10-K of SunPower Corporation;

2.     Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.     Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.     The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a)     Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities,

- 12 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTIES AND UNJUST ENRICHMENT

particularly during the period in which this report is being prepared;

(b)     Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)     Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)     Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.     The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a)     All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)     Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

\*       \*       \*

In connection with the Annual Report of SunPower Corporation (the "Company") on Form 10-K for the period ended January 3, 2016 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), each of Thomas H. Werner and Charles D. Boynton certifies, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that, to the best of his knowledge and belief: (1)  The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and (2)  The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

37.     On May 5, 2016, Defendants caused the Company issued a press release entitled "SunPower Reports First Quarter 2016 Results." The press release set forth, in relevant part:

SAN JOSE, Calif., May 5, 2016 - SunPower Corp. (NASDAQ: SPWR) today announced financial results for its first fiscal quarter ended Apr. 3, 2016.

- 13 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTIES AND UNJUST ENRICHMENT

| ($ Millions, except percentages and per-share data) | 1st Quarter 2016 | 4th Quarter 2015 | 1st Quarter 2015 |
|---|---|---|---|
| GAAP revenue | $384.9 | $374.4 | $440.9 |
| GAAP gross margin | 13.4% | 5.4% | 20.6% |
| GAAP net loss | $(85.4) | $(127.6) | $(9.6) |
| GAAP net loss per diluted share | $(0.62) | $(0.93) | $(0.07) |
| Non-GAAP revenue[1] | $433.6 | $1,363.9 | $430.6 |
| Non-GAAP gross margin[1] | 13.6% | 28.8% | 20.5% |
| Non-GAAP net income (loss)[1] | $(41.2) | $270.4 | $19.7 |
| Non-GAAP net income (loss) per diluted share[1] | $(0.30) | $1.73 | $0.13 |
| EBITDA[1] | $6.3 | $379.9 | $58.8 |

[1] Information about SunPower's use of non-GAAP financial information, including a reconciliation to U.S. GAAP, is provided under "Use of Non-GAAP Financial Measures" below.

"Our first quarter results reflect solid execution against our long term strategy," said Tom Werner, SunPower president and CEO. "With the recent launch of our Helix™ and SunPower Equinox™ complete solutions for the commercial and residential markets respectively, we are now in a position to offer standardized plug and play solutions across all primary solar applications from large scalepower plants to individual homes and businesses. This positions SunPower very well to facilitate the adoption of solar power as a mainstream energy technology.

In our upstream solar cell and panel manufacturing operations, we delivered strong yields and record panel output, and we continue to ramp volume at our new Fab 4 cell manufacturing facility. During the quarter, we also began commercial shipments of our new, lower cost, high efficiency Performance Series panel product line and we are on track to ramp volume significantly starting in the third quarter.

"In our power plant business, consistent with our strong, historical delivery execution, we continued construction on a number of key U.S. projects slated for completion during the second half of 2016, including our 100-megawatt (MW) project for NV Energy, the 102-MW Henrietta power plant and our 68-MW project for Stanford University. Additionally, we achieved commercial operation on our 50-MW Hooper project for Xcel Energy, a project currently owned by 8point3 Energy Partners. SunPower also achieved notable international success during the first quarter when we were awarded approximately 500-MW of power purchase agreements in Mexico's first electricity auction. This award comprised approximately 25 percent of the awarded solar capacity, or around 20 percent of the entire awarded energy across all resources, and demonstrates the increasing cost competitiveness of wholesale solar power versus competing technologies.

We also expect to begin construction of our second solar power plant project in Chile later this year with a capacity of approximately 100-MW. With a pipeline of more than 2.5 gigawatts (GW) in Latin America and more than 14-GW globally, we see significant long term opportunity in the power plant segment.

"Our residential business continued its strong performance as we met or exceeded our quarterly goals across all regions. In North America, we grew recognized megawatts by more than 50 percent year over year, gained market share, and launched our SunPower Equinox complete residential solution in the U.S. We believe this fully integrated product generates up to 70 percent more lifetime energy with 70 percent fewer visible components compared with a conventional residential system, while reducing installation time and improving quality and aesthetics. We also added a key residential channel partnership during the quarter including an exclusive co-marketing

- 14 -

agreement with AT&T. With solid residential industry fundamentals, particularly in the U.S, we expect continued strong performance in this segment during 2016.

"We also made significant progress in our commercial business during the quarter, adding projects to our pipeline which stands over $1 billion. The rollout of our new Helix platform is going very well as we installed our first commercial system during the quarter. As a result, we expect to double our commercial market share in the U.S. this year. Internationally, we also had a significant win in Japan during the quarter, where we booked a 17-MW supply contract with a leading Japanese commercial rooftop project developer," Werner concluded.

"Overall, we executed well in the first quarter as we achieved our development targets and saw solid performance across our segments," said Chuck Boynton, SunPower CFO. "We continued to add to our HoldCo asset base with a number of large projects scheduled for completion in the second half of the year. We exited the quarter with a strong balance sheet including significant liquidity through our $300 million revolver, which remains undrawn. In addition, we were pleased to close our most recent financing, a $200 million construction revolver that will be used to finance our anticipated growth, primarily in the commercial sector."

Additionally, first quarter fiscal 2016 non-GAAP results include net adjustments that, in the aggregate, decreased non-GAAP net loss by $44.2 million, including $10.7 million related to 8point3 Energy Partners, $3.6 million related to utility and power plant projects, $3.1 million related to sale of operating lease assets, $16.5 million related to stock-based compensation expense, $8.6 million related to other adjustments, and $1.7 million related to tax effect.

**Financial Outlook**
The company's second quarter fiscal 2016 non-GAAP guidance is as follows: revenue of $310 million to $360 million, gross margin of 12 percent to 14 percent, EBITDA of $0 to $25 million and megawatts deployed in the range of 360 MW to 385 MW. On a GAAP basis, the company expects revenue of $290 million to $340 million, gross margin of 10 percent to 12 percent and net loss of $90 million to $65 million. Second quarter 2016 GAAP guidance includes the impact of the company's HoldCo asset strategy and revenue and timing deferrals due to real estate accounting.
For fiscal year 2016, the company's non-GAAP financial guidance is unchanged. Non-GAAP expectations are as follows: revenue of $3.2 billion to $3.4 billion, gross margin of 14 percent to 16 percent, EBITDA of $450 million to $500 million, capital expenditures of $210 million to $260 million and gigawatts deployed in the range of 1.6 GW to 1.9 GW.

On a GAAP basis, the company now expects 2016 revenue of $2.8 billion to $3.0 billion, gross margin of 13 percent to 15 percent and net income of $0 million to $50 million. Fiscal year 2016 GAAP guidance includes the impact of the company's HoldCo asset strategy and revenue and timing deferrals due to real estate accounting.

38.     On May 6, 2016, Defendants caused SunPower to file its Quarterly Report with the SEC on Form 10-Q for the fiscal quarter ended April 3, 2016.  The Company's Form 10-Q was signed by defendant Boynton, and reaffirmed the Company's financial results previously announced on May 5, 2016.  The Form 10-Q also contained SOX Certifications signed by defendants Werner and

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTIES AND UNJUST ENRICHMENT

1  Boynton, which were substantially similar to those set forth above.

2      39.    The above statements by Defendants were materially false and/or misleading, as well

3  as failed to disclose material adverse facts about the Company's business, operations, and prospects.

4  Specifically, these statements were false and/or misleading statements and/or failed to disclose: (1)

5  that under Defendants' direction and on their watch, a substantial number of the Company's

6  customers were adopting a longer-term timeline for project completion; (2) that the Company's near-

7  term economic returns were deteriorating due to aggressive PPA pricing by new market entrants; (3)

8  that market disruption in the YieldCo environment was impacting the Company's assumptions related

9  to monetizing deferred profits; (4) that, as such, demand for the Company's products was significantly

10  declining; (5) that, in response, Defendants would cause the Company to implement a manufacturing

11  realignment that would result in significant restructuring charges; (6) that, as such, Defendants caused

12  the Company's fiscal year 2016 guidance to be overstated; and (7) that, as a result of the foregoing,

13  Defendants' statements about SunPower's business, operations, and prospects, were false and

14  misleading and/or lacked a reasonable basis.

15      **C.**    **The Truth Finally Emerges**

16      40.    On August 9, 2016, Defendants caused SunPower to issue a press release announcing

17  its second quarter 2016 financial results. Therein, Defendants identified multiple factors negatively

18  impacting the Company's performance and forecasts for the second half of 2016:

19      [W]e see a number of near-term industry challenges, primarily in our power plant
20      segment, that we expect to impact our business and financial performance in the
        second half of 2016. The extension of the Investment Tax Credit, as well as the bonus
21      depreciation credit, while beneficial to the long-term health of the industry, has
        reduced the urgency to complete new solar projects by the end of 2016, with many
22      customers adopting a longer-term timeline for project completion. Additionally, near-
        term economic returns have deteriorated due to aggressive PPA pricing by new market
23      entrants, including a number of large, global independent power companies. We are
        also seeing customer project IRRs rising in the near term as buyers have increased
24      their hurdle rates due to industry conditions. Finally, the continued market disruption
        in the YieldCo environment has impacted our assumptions related to monetizing
25      deferred profits.

26      41.    In response, Defendants also announced a manufacturing realignment:

27      Additionally, we are realigning our manufacturing operations to increase the relative
        mix of X-Series capacity due to expected strong customer demand in our DG business

28  _____

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTIES AND
UNJUST ENRICHMENT

as well as adjusting our panel assembly capacity to be closer to our core markets. We plan to utilize equipment from some of our older solar cell manufacturing lines in Fab 2 to debottleneck capacity of our latest generation technology in order to increase the supply of X-Series panels. These initiatives will enable us to increase X-Series output by up to 100 MW by the end of 2017. Additionally, in connection with the realignment of our power plant segment principally around our core markets, we have made the decision to close our Philippine panel assembly facility and transfer the equipment to our latest generation, lower cost facilities in Mexico. This change will optimize our supply chain and move final panel assembly closer to our key markets.

*     *     *

As a result of the announced realignment, the company expects the following:

- Workforce reduction of approximately 15 percent or 1,200 employees, primarily related to its Philippine facility closure
- Restructuring charges totaling $30-$45 million
- Substantial portion of charges to be incurred in the third quarter of 2016 with more than 50 percent of the total charges to be cash
- Annual operating expense reductions of approximately 10 percent

42.    Finally, Defendants announced that as a result of the "challenges" described above, they were negatively revising the Company's fiscal year 2016 guidance:

**Financial Outlook**

As a result of the challenges described above, the company is updating its previously disclosed fiscal year 2016 guidance, as well as providing selected forecasts for fiscal year 2017.

On a GAAP basis, the company now expects 2016 revenue of $2.8 billion to $3.0 billion, gross margin of 9.5 percent to 11.5 percent and net loss of $175 million to $125 million. Fiscal year 2016 GAAP guidance includes the impact of the company's HoldCo asset strategy and revenue and timing deferrals due to real estate accounting.

The company's updated 2016 non-GAAP financial guidance is as follows: revenue of $3.0 billion to $3.2 billion, gross margin of 10.5 percent to 12.5 percent, EBITDA of $275 million to $325 million, capital expenditures of $225 million to $245 million and gigawatts deployed in the range of 1.45 GW to 1.65 GW.

For 2017, the company expects a GAAP net loss of $200 million to $100 million and EBITDA in the range of $300 million to $400 million. The company expects that at the lower end of the guidance range, 2017 EBITDA would be generated almost entirely from the company's DG business and believes that with the announced realignment, it will be well positioned to capitalize on the long term growth potential in the global power plant market.

The company's third quarter fiscal 2016 GAAP guidance is as follows: revenue of $700 million to $800 million, gross margin of 14.5 percent to 16.5 percent and net loss of $5 million to net income of $20 million. Third quarter 2016 GAAP guidance includes the impact of the company's HoldCo asset strategy and revenue and timing deferrals due to real estate accounting. On a non-GAAP basis, the company expects revenue of $750 million to $850 million, gross margin of 16.5 percent to 18.5 percent, EBITDA of $115 million to $140 million and megawatts deployed in the range of 380

MW to 420 MW.

43. During SunPower's August 9, 2016 earnings conference call, a securities broker bluntly asked defendant Werner about the startling financial revisions:

> Tom… my first question is how quickly did you guys know this, because people are going to walk away and say, everything was hunky-dory in the first couple of months of the year and all of a sudden about-face and now it's bad. And so I want to understand how quickly you knew this, so that people don't walk away and say…Tom is a liar…

44. Defendant Werner disclosed only that market developments leading to the Company's financial revision "materialized in May" of 2016.

45. On this news, SunPower's stock price fell $4.47 per share, or 30%, to close at $10.31 per share on August 10, 2016.

46. Further, the price of the Company's stock still has not recovered, and currently trades below that share price.

47. Thus, as a result of Defendants' actions, the Company has suffered damages. These damages include (but are not limited to) severe loss of reputation and standing, and decimation of the Company's stock price.

## DERIVATIVE AND DEMAND ALLEGATIONS

48. Plaintiff brings this action derivatively in the right and for the benefit SunPower to redress the breaches of fiduciary duty and other violations of law by Defendants.

49. Plaintiff will adequately and fairly represent the interests of SunPower and its shareholders in enforcing and prosecuting its rights.

50. The Board currently consists of the following nine (9) directors: defendants Werner, Chaperon, Clément, Giorno, Lauré, Lesjak, McDaniel, de Wendel, and Wood. Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful and useless act, for the reasons that follow.

### A. A Majority of the Board Admittedly Lacks Independence

51. Demand is admittedly futile because, as set forth below, defendants Werner, Chaperon, Clément, Giorno, Lauré, and de Wendel (a majority of the Board) are not independent,

which Defendants admit in the Company's 2016 Proxy.  Similarly, the Total Defendants (Chaperon, Clément, Giorno, Lauré, and de Wendel) were all appointed by the same entity (and hold or held high ranking positions within that entity), are not independent, and constitute a majority of the Board.

52.    The principal professional occupation of defendant Werner is his employment with SunPower as its CEO, pursuant to which he receives substantial monetary compensation and other benefits.  In addition, according to the 2016 Proxy, Defendants have admitted that defendant Werner is not independent.   Thus, defendant Werner lacks independence from demonstrably interested directors, rendering him incapable of impartially considering a demand to commence and vigorously prosecute this action.

53.    Defendant Chaperon lacks independence from defendants Clément, Giorno, Lauré, and de Wendel (*i.e.*, the other Total Defendants) due to his close business and personal relationships with them as a result of (among other things) his role as Senior Vice President of Prospective Analysis, Institutional Relations and Communications for the New Energies division of Total S.A.  In this role, he has a close business affiliation with defendant Clément, who serves as the Senior Vice President, Business & Operations, of the New Energies division of Total S.A. since July 1, 2012. Defendant Chaperon also has or had until very recently a close business relationship with defendant Giorno, who served as President and CEO of Total New Energies USA until April 2016.  Defendant Chaperon also has a close business relationship with defendant Lauré, due to his role as President and CEO of Total New Energies USA Inc.  Finally, defendant Chaperon has a close business relationship with defendant de Wendel due to his role as Treasurer of the Total group.  In addition, according to the 2016 Proxy, Defendants have admitted that defendant Chaperon is not independent.  As a result of these intertwined business relationships and Defendants' own admissions, defendant Chaperon would be unable to impartially consider a demand to prosecute this action against the other Total Defendants.

54.    Defendant Clément lacks independence from defendants Chaperon, Giorno, Lauré, and de Wendel (*i.e.*, the other Total Defendants) due to his close business and personal relationships with them as a result of (among other things) his role as Senior Vice President, Business & Operations,

of the New Energies division of Total S.A. since July 1, 2012.  Specifically, defendant Clément lacks independence from defendant Chaperon due to the close business relationship as a result of defendant Chaperon's role as Senior Vice President of Prospective Analysis, Institutional Relations and Communications for the New Energies division of Total S.A.  Defendant Clément also has a close business relationship defendant Giorno, who served as President and CEO of Total New Energies USA until April 2016, and thus lacks independence from defendant Giorno.  Further, defendant Clément lacks independence from defendant Lauré, due to his role as President and CEO of Total New Energies USA Inc.  Finally, defendant Clément has a close business relationship with defendant de Wendel due to his role as Treasurer of the Total group.  In addition, according to the 2016 Proxy, Defendants have admitted that defendant Clément is not independent.  As a result of these intertwined business relationships and Defendants' own admissions, defendant Clément would be unable to impartially consider a demand to prosecute this action against the other Total Defendants.

55.     Defendant Giorno lacks independence from defendants Chaperon, Clément, Lauré, and de Wendel (*i.e.*, the other Total Defendants) due to his close personal and business relationships with them as a result of (among other things) his role as President and CEO of Total New Energies USA until April 2016.  In this role, he had a close business affiliation with defendant Clément, who serves as the Senior Vice President, Business & Operations, of the New Energies division of Total S.A. since July 1, 2012.  Defendant Giorno also had a close business relationship with defendant Chaperon in connection with his role as Senior Vice President of Prospective Analysis, Institutional Relations and Communications for the New Energies division of Total S.A.  Defendant Giorno also has or had a close business relationship with defendant Lauré, due to his role as President and CEO of Total New Energies USA Inc.  Finally, defendant Giorno had a close business relationship with defendant de Wendel due to his role as Treasurer of the Total group.  In addition, according to the 2016 Proxy, Defendants have admitted that defendant Giorno is not independent.  As a result of these intertwined business relationships and Defendants' own admissions, defendant Giorno would be unable to impartially consider a demand to prosecute this action against the other Total Defendants.

56.     Defendant Lauré lacks independence from defendants Chaperon, Clément, Giorno,

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTIES AND UNJUST ENRICHMENT

and de Wendel (*i.e.*, the other Total Defendants) as a result of (among other things) his role as President and CEO of Total New Energies USA Inc., and would be unable to impartially consider a demand against the other Total Defendants.  In this role, he has a close business affiliation with defendant Clément, who serves as the Senior Vice President, Business & Operations, of the New Energies division of Total S.A. since July 1, 2012.  Defendant Lauré also as a close business relationship with defendant Giorno, who served as President and CEO of Total New Energies USA until April 2016.  Defendant Lauré also has a close business relationship with defendant Chaperon, due to his role as Senior Vice President of Prospective Analysis, Institutional Relations and Communications for the New Energies division of Total S.A.  Finally, defendant Lauré has a close business relationship with defendant de Wendel due to his role as Treasurer of the Total group.  In addition, according to the 2016 Proxy, Defendants have admitted that defendant Lauré is not independent.  As a result of these intertwined business relationships and Defendants' own admissions, defendant Lauré would be unable to impartially consider a demand to prosecute this action against the other Total Defendants.

57.     Defendant de Wendel lacks independence from defendants Chaperon, Clément, Giorno and Lauré (*i.e.*, the other Total Defendants) as a result of (among other things) his role as Total group Treasurer.  In this role, he has a close business affiliation with defendant Clément, who serves as the Senior Vice President, Business & Operations, of the New Energies division of Total S.A. since July 1, 2012.  Defendant de Wendel also as a close business relationship with defendant Giorno, who served as President and CEO of Total New Energies USA until April 2016.  Defendant de Wendel also has a close business relationship with defendant Chaperon, due to his role as Senior Vice President of Prospective Analysis, Institutional Relations and Communications for the New Energies division of Total S.A.  Finally, defendant de Wendel has a close business relationship with defendant Chaperon due to his role as Senior Vice President of Prospective Analysis, Institutional Relations and Communications for the New Energies division of Total S.A.  In addition, according to the 2016 Proxy, Defendants have admitted that defendant de Wendel is not independent.   As a result of these intertwined business relationships and Defendants' own admissions, defendant de

1  Wendel would be unable to impartially consider a demand to prosecute this action against the other

2  Total Defendants.

3          **B.      Other Reasons Demand is Futile**

4          58.     Defendants Werner, Chaperon, Clément, Giorno, Lauré, Lesjak, McDaniel, de

5  Wendel, and Wood (*i.e.*, the entire Board) served as directors of the Company during some or all of

6  the wrongdoing alleged herein, and each faces a substantial likelihood of liability for their

7  participation in the illicit acts alleged herein.  The statements and actions regarding the Company's

8  operations and financial guidance and omissions with respect to the impending manufacturing

9  realignment (as set forth herein) that defendants Werner, Chaperon, Clément, Giorno, Lauré, Lesjak,

10  McDaniel, de Wendel, and Wood caused or allowed to be made repeatedly during the Relevant Period

11  were an integral aspect of the Company's core operations.  It was these very actions and statements

12  made and/or caused or allowed to be made by defendants Werner, Chaperon, Clément, Giorno, Lauré,

13  Lesjak, McDaniel, de Wendel, and Wood that caused the Company to suffer severe reputational harm,

14  as set forth herein.  This was in violation of (among other things) these Defendants' fiduciary duties

15  of good faith and loyalty, as well as the Code of Ethics.  Thus, defendants Werner, Chaperon,

16  Clément, Giorno, Lauré, Lesjak, McDaniel, de Wendel, and Wood (the entire Board) each faces a

17  substantial likelihood of liability for their acts in connection with these actions and statements,

18  rendering a demand upon them futile.

19          59.     During the Relevant Period, defendants Lesjak, McDaniel and Wood served as

20  members of the Audit Committee.  Pursuant to the Audit Committee Charter, the members of the

21  Audit Committee were and are responsible for, *inter alia*, reviewing the Company's annual and

22  quarterly financial reports, reviewing the integrity of the Company's internal controls, and ensuring

23  that the Company was in compliance with legal and regulatory requirements (and the Code of Ethics).

24  Defendants Lesjak, McDaniel and Wood breached their fiduciary duties of due care, loyalty, and good

25  faith, because the Audit Committee, *inter alia*, allowed or permitted the Company to disseminate

26  false and misleading statements in the Company's SEC filings and other disclosures, caused the

27  above-discussed internal control failures, and caused or allowed the illicit activity described herein.

28

1 Therefore, defendants Lesjak, McDaniel and Wood face a substantial likelihood of liability for their

2 breach of fiduciary duties, and any demand upon them is futile.

3      60.    Defendants Werner, Chaperon, Clement, Giorno, Lesjak, McDaniel, de Wendel and

4 Wood (a majority of the Board) each signed (or authorized the signing of) the false and misleading

5 2015 10-K described herein.  The 2015 10-K, signed and authorized by these Defendants, was false

6 and misleading because it failed to disclose (among other things): (1) that under Defendants' direction

7 and on their watch, a substantial number of the Company's customers were adopting a longer-term

8 timeline for project completion; (2) that the Company's near-term economic returns were

9 deteriorating due to aggressive PPA pricing by new market entrants; (3) that market disruption in the

10 YieldCo environment was impacting the Company's assumptions related to monetizing deferred

11 profits; (4) that, as such, demand for the Company's products was significantly declining; and (5)

12 that, in response, Defendants would cause the Company to implement a manufacturing realignment

13 that would result in significant restructuring charges.  As a result, defendants Werner, Chaperon,

14 Clement, Giorno, Lesjak, McDaniel, de Wendel and Wood (a majority of the Board) each face a

15 substantial likelihood of liability for their actions described herein, rendering any demand upon them

16 futile.

17 **COUNT I**

18 **AGAINST ALL DEFENDANTS FOR BREACH OF FIDUCIARY DUTIES**

19      61.    Plaintiff incorporates by reference and realleges each and every allegation set forth

20 above, as though fully set forth herein.

21      62.    As alleged in detail herein, each of the Defendants (and particularly the Audit

22 Committee Defendants) had a duty to ensure that SunPower disseminated accurate, truthful and

23 complete information to its shareholders.

24      63.    Defendants violated their fiduciary duties of care, loyalty, and good faith by causing

25 or allowing the Company to disseminate to SunPower shareholders materially misleading and

26 inaccurate information through, *inter alia*, SEC filings and other public statements and disclosures as

27 detailed herein.  These actions could not have been a good faith exercise of prudent business

28

1    judgment.

2        64.    As alleged herein, each of the Defendants had a fiduciary duty to, among other things,

3    ensure that the Company was operated in a lawful manner and to exercise good faith to ensure that

4    the Company's financial statements were prepared in accordance with GAAP, and, when put on

5    notice of problems with the Company's business practices and operations, exercise good faith in

6    taking appropriate action to correct the misconduct and prevent its recurrence.

7        65.    Defendants willfully ignored the obvious and pervasive problems with SunPower's

8    internal controls practices and procedures and failed to make a good faith effort to correct the

9    problems or prevent their recurrence.

10       66.    Defendants' misconduct alleged herein constituted an abuse of their ability to control

11   and influence SunPower, for which they are legally responsible.  In particular, Defendants abused

12   their positions of authority by causing or allowing SunPower to misrepresent material facts regarding

13   its business practices, financial position and business prospects.

14       67.    Defendants had a duty to SunPower and its shareholders to prudently supervise,

15   manage and control the operations, business and internal financial accounting and disclosure controls

16   of SunPower.

17       68.    Defendants, by their actions and by engaging in the wrongdoing described herein,

18   abandoned and abdicated their responsibilities and duties with regard to prudently managing the

19   businesses of SunPower in a manner consistent with the duties imposed upon them by law.  By

20   committing the misconduct alleged herein, Defendants breached their duties of due care, diligence

21   and candor in the management and administration of SunPower's affairs and in the use and

22   preservation of SunPower's assets.

23       69.    During the course of the discharge of their duties, Defendants knew or recklessly

24   disregarded the unreasonable risks and losses associated with their misconduct, yet Defendants

25   caused SunPower to engage in the scheme complained of herein which they knew had an

26   unreasonable risk of damage to SunPower, thus breaching their duties to the Company.  As a result,

27   Defendants grossly mismanaged SunPower.

28
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTIES AND
UNJUST ENRICHMENT

70.     As a direct and proximate result of the Defendants' foregoing breaches of fiduciary duties, the Company has sustained damages.

71.     As a result of the misconduct alleged herein, Defendants are liable to the Company.

72.     Plaintiff, on behalf of SunPower, has no adequate remedy at law.

## COUNT II

## AGAINST ALL DEFENDANTS FOR UNJUST ENRICHMENT

73.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

74.     By their wrongful acts and omissions, the Defendants were unjustly enriched at the expense of and to the detriment of SunPower in the form of salaries, bonuses, and other forms of compensation.

75.     Plaintiff, as a shareholder and representative of SunPower, seeks restitution from these Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by these Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.     Against all Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary duties;

B.     Directing SunPower to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

- 25 -

C.     Awarding to SunPower restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Defendants;

D.     Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.     Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.


Dated: September 16, 2016            **BRODSKY & SMITH, LLC**

EVAN J. SMITH (SBN 242352)

9595 Wilshire Blvd.
Beverly Hills, CA 90212
Telephone: (877) 534-2590
Facsimile: (310) 247-0160

**PROFY  PROMISLOFF  &  CIARLANTO, P.C.**
JEFFREY. J. CIARLANTO
JOSEPH M. PROFY
DAVID M. PROMISLOFF
100 N. 22nd Street, Unit 105
Philadelphia, PA 19103
Telephone: (215) 259-5156
Facsimile: (215) 600-2642

**LAW OFFICE OF ALFRED G. YATES, JR., P.C.**
ALFRED G. YATES, JR.
GERALD L. RUTLEDGE
519 Allegheny Building
429 Forbes Avenue
Pittsburgh, PA 15219
Phone: (412) 391-5164
Fax: (412) 471-1033

*Attorneys for Plaintiff*

- 26 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTIES AND UNJUST ENRICHMENT